**Affirmed; Opinion Filed November 7, 2019**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-18-00710-CR

### TALAL ALI CHAMMOUT, Appellant
### V.
### THE STATE OF TEXAS, Appellee

**On Appeal from the Criminal District Court No. 3**
**Dallas County, Texas**
**Trial Court Cause No. F-1700181-J**

# MEMORANDUM OPINION

Before Justices Bridges, Molberg, and Partida-Kipness
Opinion by Justice Molberg

A jury convicted Talal Ali Chammout of sexual assault. The trial court assessed punishment at twenty-five years' imprisonment. In a single point, Chammout challenges the sufficiency of the evidence to support his conviction. We affirm the trial court's judgment.

## BACKGROUND

### *Procedural History*

Chammout was charged in separate indictments with two separate and distinct sexual assaults against the same victim on the same night. One indictment alleged sexual assault by penile penetration of the victim's vagina. The other indictment alleged a subsequent sexual assault by mouth-to-vagina contact. The cases were tried jointly to a jury, which found Chammout guilty of

sexual assault by mouth-to-vagina contact and not guilty of sexual assault by penile penetration. The trial court assessed punishment at twenty-five years' imprisonment.

*Factual History*

We recount the facts to the extent necessary to resolve the issue on appeal.

Lyndsey's Testimony

On July 25, 2015 at 2 p.m., the complainant, Lyndsey (pseudonym), met friends to celebrate her friend Courtney's (pseudonym) birthday.[1] At two different restaurants, Lyndsey ate and drank "mixed drink" alcoholic beverages with her friends. When the party ended at approximately 8 p.m., Lyndsey was too intoxicated to drive, so Courtney used Lyndsey's phone to schedule an Uber ride to take Lyndsey home. Lyndsey lived in the home with her boyfriend, Jay (pseudonym).[2]

A "big, black car" pulled up to the restaurant and, after saying goodbye to her friends, Lyndsey got into the car and confirmed it was her Uber ride. Lyndsey testified, "It seemed pretty normal at first, just getting into an Uber, nothing out of the ordinary." The driver, Chammout, and Lyndsey engaged in "small talk." Lyndsey started to feel uncomfortable when Chammout began "looking at [her] body up and down while driving" and repeatedly "compliment[ing her] looks and [her] body."

Lyndsey testified that Chammout repeatedly told her he wanted to "help [her] up to the house," despite her repeated statements that she did not want his help. Chammout's "comments about [her] looks and his leering at [her]," his insistence that he "help" her to her house, and his demeanor made Lyndsey "nervous":

---

[1] To protect Lyndsey's identity, in this opinion, we use pseudonyms for Lyndsey, Courtney, and Lyndsey's boyfriend, Jay. The first initial of Courtney's and Jay's names corresponds with the first initial of the names used in the parties' briefs on appeal.

[2] At the time of trial, Lyndsey and Jay were no longer dating, and they had not seen each other in over a year and a half.

> It was his demeanor. It was his insisting to help me up the stairs, because I had been drinking—or to help me up to the house, because I had been drinking, and I wanted no further interaction with him. I continued to say: No, thank you. I'll be fine. No, thank you. I'll get up to the house just fine.

When they arrived at her home, Lyndsey tried to "get out [of the car] quickly and get up those stairs and get away from him" but "by the time [she] got out of the car and closed the door, he was already out of the vehicle . . . with his door closed." Lyndsey testified, "He was just there all of a sudden out of the car in my driveway, standing on my driveway."

Standing in Lyndsey's driveway, Chammout continued to badger her and insist on walking her up to the house. Lyndsey finally capitulated and said he could walk her up the stairs to her house. The front door of the house entered directly into the home office. Lyndsey testified:

> Then I unlocked the door and opened it and walked in. And the next thing I know, he's inside of the house. . . . With the door closed behind him.
>
> [It] was extremely disturbing. There was no point at which I wanted him to walk me and certainly not to be inside of the home.
>
> [I] repeatedly asked him to please leave, please leave. I'm okay now. Please leave. And he continued to insist to make sure that I was okay, sit down, and you know, make sure I get to bed. And do you need anything? No, thank you. Please leave.

Lyndsey continued:

> [A]fter begging him to please leave continuously, one of my last, firm—more firm memories was that it seemed that he had—he had said, okay, and was about to leave. And one of my last memories was him turning and walking as if he was about to leave.
>
> [I] thought that he was leaving. And, so, then I turned away. I was feeling very nauseous at the time, a combination of just having drank a lot and being extremely intoxicated. And then after that, it just goes dark for a little bit.

The next thing Lyndsey remembered was "coming to" with her "ears ringing" and her vision unfocused. She felt penetration of her vagina. Confused and disoriented, Lyndsey tried to focus her vision. She "felt like [she] was on [her] back." Lyndsey testified, "all I could do while

trying [to] get a clear vision out of an unclear state just being able to make out that it was [Chammout's] face." Then, Lyndsey blacked out again.

Lyndsey's next memory was waking up the following morning, disoriented, naked from the waist down, and with a terrible headache. She had a knot on the back of her head and an open wound on her knee. She did not know how she sustained either injury. Lyndsey testified:

> I woke up without underwear on or bottoms and—which is strange because I usually sleep with those on and it's just off—on the edge of the bed with my feet kind of hanging off the bed and just a bit perpendicular to the way that you would normally lie. So just a strange position that I can't recall getting into.

Lyndsey was "so confused" and her memory of Chammout in her home was "so hazy and foggy" that she was not sure if it had all been a nightmare. Lyndsey knew it was not a nightmare when Jay told her that the front door was unlocked when he arrived at their house the previous night shortly after 9 p.m. Lyndsey could not find the shorts or underwear she wore the night before. Although it was not Lyndsey's practice to put her belongings in the home office, her emptied purse and its contents were spread out on the home office desk. In a text message, Lyndsey told Courtney she had a "giant scrape" on her knee and she asked Courtney if she had fallen when they were celebrating. Courtney responded that she did not see Lyndsey fall.

Lyndsey testified she did not consent to Chammout making contact with her vagina with his mouth. Nor did Lyndsey consent to Chammout having sexual intercourse with her or inserting his penis into her vagina. Lyndsey testified she was not in any condition that night to consent to sex with anyone; and, taking alcohol out of the equation, she could not conceive of any possible scenario in which she would consent to sex, oral or otherwise, with Chammout.

### Jay's Testimony

At trial, Jay testified that when he got home after 9 p.m. on the night of the sexual assault, the front door was unlocked, which was "unusual." When Jay opened the front door and entered

the home office, he observed Lyndsey's shoes, purse, and phone "strewn about," and several things were "pushed aside," all which was "very" unusual. Jay walked downstairs to the bedroom to see if Lyndsey was home. He found her "halfway on, halfway off the bed" and naked. Jay testified it was not normal for Lyndsey to sleep without her clothes on. After moving Lyndsey onto the bed and covering her with a blanket, Jay went upstairs to watch television and fell asleep on the sofa. Jay learned that Lyndsey had been sexually assaulted after she called the police on July 27, 2015.

<u>Officer Francis' and Crime Scene Analyst Wayland's Testimony</u>

Lyndsey called 9-1-1 on July 27, after Jay left for work. Dallas Police Officer George Francis and an officer trainee responded to the call at Lyndsey's home. Officer Francis testified that Lyndsey was "very upset" and "in distress" when he arrived. Lyndsey told Officer Francis that Chammout, her Uber driver, had sexually assaulted her and she showed him Chammout's picture on the Uber application on her phone. Officer Francis ordered a crime scene detective to come to the house. Julia Wayland, a crime scene analyst for the Dallas Police Department, responded to Officer Francis' call. Analyst Wayland testified that when she arrived at the house, Lyndsey was "very confused, and very upset and just distraught in general." After Lyndsey spoke with police officers and crime scene analysts, Officer Francis took Lyndsey to the hospital, where she underwent a sexual assault exam.

<u>Chammout's Video-Recorded Police Interrogation and Detective Lopez's Testimony</u>

Detective Lopez is a Dallas Police Department detective assigned to the Sexual Assault Unit. After Chammout was arrested and read his *Miranda*[3] rights, he agreed to talk to Detective Lopez. The interview was video-taped. The recorded interview was introduced into evidence at trial and played for the jury.[4] In the video, Chammout tells Detective Lopez that after entering the

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[4] The video introduced into evidence was redacted, as agreed to by the State and Chammout.

house through the front door, he removed Lyndsey's shorts and underwear, and he had sex with Lyndsey on a desk. After Chammout ejaculated inside her, Lyndsey "went downstairs," still naked from the waist down, leaving her clothes, phone, and purse in the office. The jury heard Chammout state he went downstairs when Lyndsey did not return because he "wanted to make sure she was okay."

In the video, Chammout tells Detective Lopez he found Lyndsey sleeping on the floor next to her bed, still naked from the waist down. The jury heard Chammout say he tapped her on the arm and tried to wake her up; she kissed him; and he put her on the bed. Then, pointing directly to his groin, Chammout tells Detective Lopez, "Actually, I kissed her here." Pointing to the upper portion of his right inner thigh and the upper portion of his left inner thigh, Chammout tells Detective Lopez he also kissed Lyndsey "here and here."

Later in the video, Chammout again tells Detective Lopez he found Lyndsey sleeping on the floor next to her bed, and he put her on the bed. Although Chammount says "no" when Detective Lopez asks him if he kissed her vagina, Chammout immediately pauses and says, "Well…" and pauses again. Leaning onto his left buttock in the chair, Chammout lifts his right leg, spreads his legs far apart and tells Detective Lopez "she had her legs like this." With his legs still spread apart, Chammout twists in his chair so his back is facing the camera. Leaning further onto his left buttock with his legs splayed open, he states, "she had her legs like that." With his legs still spread, Chammout's right elbow is visible as he points and tells Detective Lopez he "kissed her here, here."

At trial, Detective Lopez testified, "[Chammout] pointed to his right inner thigh, left inner thigh, and then to his midsection where [Lyndsey's] vagina would be." Even though Chammout denied kissing Lyndsey's "vagina," Detective Lopez testified Chammout continued to point to his groin where Lyndsey's vagina would be. Although the camera angle partially obscures where

–6–

Chammout was pointing after he twisted in his chair with his legs splayed open, the camera view is not obscured the first time Chammout pointed to his groin where Lyndsey's vagina would be and to his upper inner thighs while describing to Detective Lopez where he kissed Lyndsey. Moreover, Detective Lopez testified that his view of Chammout's gestures was not obscured, and he observed Chammout pointing to his groin where Lyndsey's vagina would be when Chammout described where he kissed Lyndsey.

Detective Lopez testified that Chammout said he went downstairs to check on Lyndsey because he was scared. Detective Lopez also testified that indications Lyndsey was so intoxicated so as to not have full control of her mental faculties included: she immediately walked downstairs "without an explanation with no pants or underwear on" after Chammout had sex with her; she "missed the bed and fell down onto the floor" and remained passed out on the floor naked from the waist down; Chammout "tap[ped]" her because she was "out"; and Chammout picked up Lyndsey and put her on the bed because she was "out of it" and apparently unable to get into bed herself.

## STANDARD OF REVIEW

In reviewing a challenge to the sufficiency of the evidence, we examine all the evidence in the light most favorable to the verdict and determine whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010). We review both direct and circumstantial evidence and reasonable inferences that may be drawn therefrom. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Direct and circumstantial evidence are treated equally. *Id.* Circumstantial evidence alone can be sufficient to establish guilt. *Hooper v. State*, 214 S.W.3d 9, 15 (Tex. Crim. App. 2007).

The jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony, and we defer to the jury's credibility and weight determinations. *See Jackson*, 443 U.S. at 326; *Brooks*, 323 S.W.3d at 899. The jury may reasonably infer facts from the evidence presented, credit the witnesses it chooses to, disbelieve any or all of the evidence or testimony proffered, and weigh the evidence as it sees fit. *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986). We may not substitute our judgment for that of the fact finder by re-evaluating the weight and credibility of the evidence produced at trial. *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000). Reconciliation of conflicts in the evidence is within the jury's discretion, and such conflicts alone will not call for reversal if there is enough credible evidence to support a conviction. *Losada v. State*, 721 S.W.2d 305, 309 (Tex. Crim. App. 1986). Therefore, inconsistencies in the evidence are resolved in favor of the verdict. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

## ANALYSIS

As relevant to this appeal, Chammout committed sexual assault if he intentionally or knowingly caused his mouth to contact Lyndsey's vagina without Lyndsey's consent (1) by use of physical force or violence; or (2) if Chammout knew Lyndsey was unconscious or physically unable to resist; or (3) if Chammout knew Lyndsey was unaware the sexual assault was occurring.

### *The Evidence Is Sufficient to Establish Mouth-to-Vagina Contact*

Chammout contends the evidence is insufficient to establish his mouth made contact with Lyndsey's vagina. In support of his argument, Chammout first argues, "[Lyndsey] never said a single word to anyone—not in her interviews, not at the hospital, and not at trial—accusing Chammout of kissing her vagina." Chammout also argues his gesture in the video recording of his interview with Detective Lopez "might have meant [Lyndsey's] vagina—or it might have meant the area of her lower abdomen just above her vagina."

Chammout's first argument does not help him in this appeal. To the contrary, it supports the jury's conclusion that Chammout committed sexual assault to the extent it demonstrates lack of consent in this case, *i.e.*, that Lyndsey was unconscious and unaware that Chammout's mouth came into contact with her vagina. Indeed, the record demonstrates that if Chammout had not voluntarily told and demonstrated to Detective Lopez how he kissed Lyndsey's vagina and the upper portion of Lyndsey's inner thighs, Lyndsey would not have known about Chammout's mouth-to-vagina sexual assault.

Chammout's second argument also is unavailing. At trial, the video recording of Chammout's interview with Detective Lopez was played for the jury. The jury saw and heard Chammout describe finding Lyndsey naked from the waist down and passed out on the floor, picking her up and putting her on the bed, and kissing her between and on her legs. The jury saw Chammout—unobscured—point directly to his groin, his right inner thigh, and his left inner thigh while describing where he kissed Lyndsey. In a subsequent, more graphic demonstration of how he kissed Lyndsey between her legs, Chammout turned in his chair and contorted himself with his legs spread far apart to demonstrate the awkward positioning of Lyndsey's legs. The jury saw Chammout gesture again with his legs splayed open when describing where he kissed Lyndsey.

The jury heard Detective Lopez's testimony that, although the camera angle partially obscured Chammout's gesture when he had his legs splayed open, Detective Lopez's view was not obscured and he saw Chammout point to his groin where Lyndsey's vagina would be.

Keeping in mind that it is the jury's responsibility to weigh the evidence, to draw reasonable inferences from basic facts to ultimate facts, to resolve conflicting testimony, and to resolve conflicting inferences in the evidence, we must presume that the jury resolved the conflicts in favor of the verdict and we must defer to that resolution. *Arroyo v. State*, 559 S.W.3d 484, 487 (Tex. Crim. App. 2018); *Matson v. State*, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991). Moreover,

we determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict. *Murray v. State*, 457 S.W.3d 446, 448–49 (Tex. Crim. App. 2015). Viewing the evidence in the light most favorable to the verdict and accepting, as we must, the jury's fact determinations and any conflicting inferences, there is ample evidence from which the jury rationally could conclude beyond a reasonable doubt that Chammout's mouth came into contact with Lyndsey's vagina in what Chammout described as a kiss.

### The Evidence Is Sufficient to Establish Lack of Consent

Chammout contends the evidence is insufficient to establish lack of consent, *i.e.*, that Chammout knew Lyndsey was unconscious or unable to resist the kiss or that Chammout knew Lyndsey was unaware the kiss was occurring. In response, the State argues that Lyndsey's testimony, alone, was sufficient to establish lack of consent. We agree with the State.

Here, the jury heard Lyndsey testify she did not consent to Chammout making contact with her vagina with his mouth and she did not consent to any sexual activity with Chammout. The jury is the exclusive judge of the credibility of the witnesses and the weight to be given their testimony, and Lyndsey's testimony that she did not consent, alone, is sufficient to establish lack of consent. *Briseño v. State*, 293 S.W.3d 644, 646 (Tex. App.—San Antonio 2009, no pet.); s*ee also Montgomery v. State*, No. 02-18-00438-CR, 2019 WL 4122610, at *6 (Tex. App.—Fort Worth Aug. 29, 2019, no pet.) (not designated for publication).

Moreover, the jury heard Lyndsey testify that she was extremely intoxicated and she blacked out at least twice while Chammout was in her home—once before she felt penetration of her vagina in the home office and again during penetration of her vagina in the home office. Lyndsey's last memory before waking up the next morning was seeing Chammout's face above her as she felt penetration. The jury heard Lyndsey describe her confusion when she woke up the

–10–

next morning to find herself naked from the waist down, with a large bump on the back of her head and an open wound on her knee—none of which she recalled occurring.

In the video recording of Chammout's interview with Detective Lopez, the jury saw and heard Chammout describe finding Lindsey naked from the waist down and "sleeping" on the floor, mere steps from her bed. Chammout described picking up Lyndsey from the floor and putting her on the bed. Chammout pointed to his groin where Lyndsey's vagina would be and to his upper right and upper left thighs while describing how he kissed her between and on her legs. The jury saw Chammout contort himself in the interrogation room chair with his legs splayed open to demonstrate the awkward positioning of Lyndsey's legs in her bedroom and heard Chammout describe Lyndsey as "out."

The jury heard Detective Lopez's testimony that Chammout said he went downstairs to check on Lyndsey because he was "scared"; he wanted to make sure Lyndsey was "okay"; and he found her "out" on the floor next to her bed.

The jury maintains the power to draw reasonable inferences from basic facts to ultimate facts. It was not unreasonable for the jury to infer from Lyndsey's testimony that she was unconscious and, at the least, unaware that Chammout's mouth made contact with her vagina and that Chammout knew it. Viewing the evidence in the light most favorable to the verdict, there is ample evidence from which the jury rationally could conclude beyond a reasonable doubt that Lyndsey did not consent and Chammout committed sexual assault. The evidence was neither so obviously weak that Chammout's conviction is clearly wrong and manifestly unjust nor was the jury's verdict so contrary to the evidence that the beyond-a-reasonable-doubt burden of proof was not met.

We conclude the evidence is sufficient to support Chammout's conviction for sexual

–11–

assault.  Accordingly, we resolve Chammout's sole issue against him.  We affirm the trial court's judgment.



/Ken Molberg/
KEN MOLBERG
JUSTICE

Do Not Publish
TEX. R. APP. P. 47
180710F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

TALAL ALI CHAMMOUT, Appellant

No. 05-18-00710-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court No. 3, Dallas County, Texas
Trial Court Cause No. F-1700181-J.
Opinion delivered by Justice Molberg.
Justices Bridges and Partida-Kipness participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 7th day of November, 2019.